# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JOSE RODRIGUEZ on behalf of himself and all others similarly situated,** | **CASE NO.:** |
| **Plaintiff,** | **CLASS ACTION** |
| **v.** | **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |
| **TARGET CORPORATION** | |
| **Defendant.** | **DEMAND FOR JURY TRIAL** |

Plaintiff Jose Rodriguez ("Plaintiff"), on behalf of himself and all others similarly situated, brings this class action against Target Corporation ("Target"), and on the basis of personal knowledge, information and belief, and the investigation of counsel, alleges as follows:

## INTRODUCTION

1.      This is a proposed class action on behalf of a nationwide and New York class of consumers seeking redress for Defendant's deceptive practices associated with the advertising, labeling and sale of its Up & Up 100% Wild Alaskan 1000 mg Fish Oil dietary supplement ("Product" or "Supplement").[1]

2.      Fish is a major source of healthful long-chain omega-3 fats and are rich in other nutrients such as vitamin D and selenium, high in protein, and low in saturated fat. Numerous studies have shown that consuming fatty fish 2-3 times a week reduces the risk of heart disease and stroke, as well as provides a myriad of additional health benefits. Scientific consensus is that consuming fatty fish as part of the diet materially contributes to good health.

3.      Unfortunately, most Americans do not, or cannot, consume fatty fish with such regularity and have instead turned to the consumption of fish oil.

4.       Indeed, as of 2012, fish oil supplements had become the most commonly used non-vitamin, non-mineral dietary supplement sold in the U.S., and to this day remain one of the most popular dietary supplement offerings. By 2019, the global fish oil market was valued at $1.9 billion, and is currently estimated to reach $2.8 billion by 2027. It remains a lucrative business with numerous market participants vying for consumer attention and their spending dollars.

5.      Defendant markets, labels and sells a Product prominently described as "Fish Oil."

---

[1] Products also include 100% Wild Alaskan Burpless Fish Oil and 100% Wild Alaska Half-The-Size Fish Oil.

**Principal Display Panel**                    **Supplement Fact Panel**

   

6.      The Product's principal display panel ("PDP") describes the Product as "100% Wild Alaskan Fish Oil." The supplement facts panel ("SFP") states that the Product is pure fish oil – each capsule consisting of 300 mg of Omega-3 Fatty Acids ("OM3"). The ingredient list further claims that the Product "Contains Fish: Alaskan Walleye Pollock."

7.      The side panel of the Product also represents that the Product is "fish oil" and reaffirms this narrative claiming it is from "walleye pollock caught wild in Alaskan waters," "extracted within hours to ensure maximum freshness" and is "pressed and purified" using "advanced processing technology."   The side panel also claims the Product comes from a MSC certified fishery," to further bolster the impression that the Product is pure wild Alaskan fish oil.



8.      Contrary to what is represented on the label, however, this Product is neither Wild Alaskan, nor is it Fish Oil. Rather, it is a lab synthesized solution – resulting from a chemical process known as trans-esterification, whereby an industrial solvent and ethanol are used to molecularly alter and substantially transform otherwise unmarketable **fish waste** into a consumable product known as a fatty acid ethyl ester, which Defendant deceptively pawns off on the unsuspecting public as fish oil.

9.      While the label conjures and purposefully promotes imagery of fish being caught in the wilds of Alaska, and immediately pressed for their Omega-3 rich oil to maintain "freshness," – nothing could be further from the truth.

10.     Fish oil is typically derived from small fatty fish that are pressed and processed for their Omega-3 rich oil. Large fish, such as walleye pollack, are less fatty and are caught / farmed for their meat (i.e., to make filets). At the conclusion of the de-filleting process, what remains is fish offal (i.e., fish waste in the forms of heads, bones, tails, organs and any other

useable part of the fish). This waste product is then processed for whatever oil can be derived. The oil is not otherwise fit for human consumption. Upon information and belief, it is then shipped from Alaska to Ohio, where it undergoes the trans-esterification process wherein it is substantially transformed from unusable fish waste into a refined fatty acid ethyl ester. The newly formed OM3 ethyl esters are then artificially manipulated to levels that mimic the OM3 typical of natural fish oil (i.e., 300 mg of OM3 per 1,000 mg capsule). The Product is bottled and then sold to the unsuspecting public as faux fish oil.

11.    Critically, the trans-esterification process eliminates the majority of natural fish oil's constituent ingredients and substantially transforms its Omega-3 triglycerides into ethyl esters – a substance that is materially distinct from the fish oil reasonably expected by consumers and is something not found anywhere in nature.

12.    At bottom, the most material representation on a dietary supplement label is the product's name – the fundamental indicia of its contents. What Target claims to be "100% Wild Alaskan Fish Oil," is in reality a Fatty Acid Ethyl Ester made in Ohio rendering its label misleading, deceptive and unlawful.

13.    As alleged herein, Defendants' conduct is in breach of warranty, violates N.Y. Gen. Bus. Law §§ 349 *et seq.*, N.Y. Gen. Bus. Law §§ 350 *et seq.*, and is otherwise grounds for restitution on the basis of quasi-contract/unjust enrichment.

14.    Throughout the applicable class periods, Defendant falsely represented the fundamental nature of its Product, and as a result of this false and misleading labeling, was able to sell this Product to tens of thousands of unsuspecting consumers throughout New York and the United States.

## JURISDICTION AND VENUE

15.    Jurisdiction of this Court is proper under 28 U.S.C. § 1332(d)(2). Diversity jurisdiction exists as Plaintiff Rodriguez is a resident of Bronx, New York and Defendant Target is Minnesota corporation which maintains its principal place of business in Minneapolis

Minnesota. The amount in controversy exceeds $5,000,000 for the Plaintiff and members of the Class collectively, exclusive of interest and costs, by virtue of the combined purchase prices paid by Plaintiff and members of the putative Class, and the profits reaped by Defendant from their transactions with Plaintiff and the Class, as a direct and proximate result of the wrongful conduct alleged herein, and by virtue of the injunctive and equitable relief sought.

16.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the underlying transactions and events complained of occurred and affected persons and entities located in this judicial district. Defendant has received substantial compensation affected transactions and business activity in this judicial district.

## **PARTIES**

17.     Plaintiff Jose Rodriguez is a resident of Bronx, New York.

18.     Mr. Rodriguez regularly purchased Target's Up & Up 1,000 mg Wild Alaskan Fish Oil over the past 3 years from local Target stores including one located at 40 West 225th Street, Bronx, New York 10463.

19.     Mr. Rodriguez made each of his purchases after reading and relying on Defendant's Product label.

20.     Mr. Rodriguez believed the representations on the Product's label that, among other things, it was actual fish oil.

21.     Mr. Rodriguez believed that Target lawfully marketed and sold the Product.

22.     Mr. Rodriguez relied on Defendant's labeling and was misled thereby.

23.     Mr. Rodriguez would not have purchased the Product, or would have purchased the Product on different terms, had he known the truth.

24.     Mr. Rodriguez was injured in fact and lost money as a result of Defendant's improper conduct.

25.     If Mr. Rodriguez has occasion to believe that Defendant's marketing and labeling is truthful, non-misleading, and lawful, he would consider purchasing the Product in the future.

26.     Plaintiff Rodriguez and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and deceptive and/or misleading under New York laws and the Products are misbranded; therefore, the Products are worth less than what Plaintiff and members of the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

27.     Defendant Target is incorporated and headquartered in Minneapolis Minnesota. Target is one of America's largest retail corporations operating chains of big box department stores across the United States, with 87 stores in New York.[2] Target sells its branded dietary supplements under the Up & Up brand name.[3]

## GENERAL ALLEGATIONS

### A.     OMEGA-3 FATTY ACIDS

28.     Omega-3 Fatty Acids ("Omega-3" or "OM3") are polyunsaturated carboxylic acids that provide numerous health benefits to the human body including a variety of critical organs and systems (e.g., heart, brain, eyes, blood vessels, lungs, immune, endocrine, and reproductive systems).[4]

---

[2] https://www.statista.com/statistics/1113279/total-number-of-target-stores-by-state-us/

[3] https://trademark.trademarkia.com/spring-valley-75334681.html.

[4] *Omega-3 Fatty Acids*, National Institutes of Health, Office of Dietary Supplements, available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-Consumer; H. Breivik, *Long-chain Omega-3 Specialty Oils*, Woodhead Publishing in Food Science, Technology and Nutrition at 11 (hereinafter "Breivik at ____")(Clinical research has suggested that Omega-3s help prevent cardiovascular disease, Alzheimer's, dementia, macular degeneration, and rheumatoid arthritis. There is also support that Omega-3s provide benefits for sufferers of arthritis, Crohn's disease and patients with neuropsychiatric disorders such as depression and schizophrenia).

29.     Among the 11 types of OM3s, the three most important to human physiology are alpha-linolenic acid ("ALA"), docosahexaenoic acid ("DHA") and eicosapentaenoic acid ("EPA").[5]

30.     The primary source of EPA and DHA are marine oils from fatty fish and other seafoods.

31.     Although experts have not established a daily recommended amount for DHA and EPA, the National Institutes of Health, Office of Dietary Supplements ("NIH") acknowledges that eating fatty fish rich in DHA and EPA has beneficial effects with respect to a variety of health conditions such as cardiovascular disease, age-related macular degeneration, Alzheimer's disease, dementia, dwindling cognitive function, rheumatoid arthritis, high blood pressure, and certain cancers.[6]

32.     Indeed, between 2017 and 2019, the American Heart Association ("AHA") released three science advisories related to Omega-3s, all of which recommend adults consume one to two servings of seafood per week to reduce the risk of congestive heart failure, coronary artery disease, stroke, and sudden cardiac death.[7]

---

[5] ALA Omega-3 fatty acids are primarily found in plant oils and generally used by the human body for energy. To be used for something other than energy, ALA must first be converted into EPA or DHA. Unfortunately, this conversion process is inefficient and results in only a small percentage of ALA being converted into EPA and DHA.

[6] Available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-Consumer/

[7] Etherton, P., et al, *Omega-3 Fatty Acids and Cardiovascular Disease New Recommendations From the American Heart Association*, AHA Arteriosclerosis, Thrombosis, and Vascular Biology Journal (2003) available at https://www.ahajournals.org/doi/full/10.1161/01.ATV.0000057393.97337.AE; *See also*, National Institutes of Health, *Omega-3 Fatty Acids*, available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-HealthProfessional/#:~:text=For%20people%20with%20existing%20coronary,of%20a%20physician%20%5B80%5D.

33.     In 2019 the U.S. Food and Drug Administration ("FDA") approved five qualified health claims relating to the consumption of the EPA/DHA and its effect on heart health.[8]

34.     Unfortunately, Americans generally do not consume a sufficient amount of fatty fish necessary to maintain adequate levels of EPA and DHA. In response to this deficiency, health care professionals began recommending that Americans supplement their diets with fish oil.[9]

35.     In 1995, fish oil supplements generated only $35 million in annual sales.  By 2005, that number had increased to $310 million and by 2012, fish oil supplements had become the non-vitamin/non-mineral natural product most commonly taken by both adults and children with approximately 7.8 percent of adults (18.8 million) and 1.1 percent of children age 4 to 17 (664,000) regularly consuming fish oil supplements.[10]  By 2019, the global fish oil market had grown to $1.9 billion, and is currently estimated to reach $2.8 billion by 2027.[11]

---

[8] *FDA Announces New Qualified Health Claims for EPA and DHA Omega-3 Consumption and the Risk of Hypertension and Coronary Heart Disease*, June 19, 2019, available at https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-new-qualified-health-claims-epa-and-dha-omega-3-consumption-and-risk-hypertension-and.

[9] Mackay, *A Comparison of Synthetic Ethyl Ester Form Fish Oil vs. Natural Triglyceride Form*, available from http://www.promedics.ca/site/downloads/Triglycerides%20vs%20Ethyl%20Esters.pdf.

[10] NIH, *Omega-3 Supplements: In Depth*, National Center for Complementary and Integrative Health, available at https://www.nccih.nih.gov/health/omega3-supplements-in-depth#:~:text=Use%20of%20Omega%2D3%20Supplements%20in%20the%20United%20States&text=The%20survey%20findings%20indicated%20that,in%20the%20previous%2030%20days.

[11] Global Fish Oil Market (2020 to 2027) - Opportunity Analysis and Industry Forecast - ResearchAndMarkets.com, Business Wire, available at https://www.businesswire.com/news/home/20200909005847/en/Global-Fish-Oil-Market-2020-to-2027---Opportunity-Analysis-and-Industry-Forecast---ResearchAndMarkets.com#:~:text=The%20global%20fish%20oil%20market,and%20docosahexaenoic%20acids%20 (DHA).

**B.**    **FISH OIL**

36.    Omega-3 fatty acids, including EPA and DHA, are found in a variety of fatty fish such menhaden, sardines, anchovies, salmon and tuna. The oil from these fish is extracted by a fairly straightforward process which has been employed in a similar fashion since the early 1800s whereby fish are caught, cooked and pressed.[12]

37.    Today, the process remains relatively the same. Once fish are caught, they are on-boarded to a fishing vessel and quickly boiled. The fish are cooked and pressed, separating the water and oil from proteins and solids. Thereafter, the water is separated from the oil. The oil undergoes a polishing process (i.e., deacidifying, degumming, and washing the oil several times). It is subsequently bleached and deodorized.  The resulting oil is ultimately encapsulated and sold as supplements. The diagram below represents the most common method for processing fish oil.[13]

---

[12] Breivik at 28.

[13] Bimbo, A. (2011). *Marine oils; edible oil processing*. AOCS Lipid Library, December 2016, available at https://lipidlibrary.aocs.org/edible-oil-processing/marine-oils. The graph represents the wet reduction process -- the most common method used to convert raw fish into fish oil.



38.     Most significantly, common fish oil is ***derived using a physical, rather than a chemical process***, such that no chemical bonds are broken or created during the extraction, bleaching or deodorizing process. "Fish oil is produced without solvent extraction [but rather] is pressed out of the cooked fish."[14]

39.     The Omega-3 fatty acids found in fish oil occur naturally in triglyceride ("TAG") form. Triglyceride is the term used to define the molecular structure which bond these fatty acids (i.e., EPA and DHA) to a glycerol backbone. Triglycerides are the natural molecular form that make up virtually all fats and oils in both animals and plants and which the human body can directly digest.[15]

---

[14] Breivik at 25.

[15] *See, e.g.,* Omega3 of Norway, available at https://norwayomega.com/omega3-fish-oil/#natural-triglycerides-vs-artificial-ethylesters (last visited April 14, 2021).

## C.    FATTY ACID ETHYL ESTERS

40.    In the early 1980's, the Japanese pharmaceutical company Mochida developed a large-scale method to synthesize EPA and DHA into an ethyl ester chemical form. In addition to yielding OM3s far in excess of that provided in fish oil, the process, known as trans-esterification, also presented a significant cost savings to manufacturers because the raw starting material was discarded fish waste, low grade and rancid fish oils, which were otherwise unusable for human consumption.[16]

41.    The conversion of fish waste into a useable Omega-3 requires the chemical alteration of fish oil on a molecular level, substantially transforming it from a natural product, into a synthetic product known as a fatty acid ethyl ester – a substance that is not found anywhere in nature, and which has not been comparably viewed by leading health authorities.

### (1)    *The Trans-Esterification Process*

42.    The first step in the trans-esterification process involves a chemical reaction whereby the glycerol backbone of each triglyceride molecule in the fish oil is broken by introduction of an industrial chemical solvent, such as sodium hydroxide, resulting in the formation of free fatty acids and a free glycerol molecule.[17] The free fatty acid forms of EPA and DHA, which are inherently unstable, are then chemically reacted with ethanol (an industrial

---

[16] Klinik, M., *A Review of Omega-3 Ethyl Esters for Cardiovascular Prevention and Treatment of Increased Blood Triglyceride Levels*, Vasc Health Risk Manag (2006), doi: 10.2147/vhrm.2006.2.3.251.

[17] Douglas MacKay, ND, *A Comparison of Synthetic Ethyl Ester Form Fish Oil vs. Natural Triglyceride Form* ("MacKay Publication"), http://www.promedics.ca/site/downloads/Triglycerides%20vs%20Ethyl%20Esters.pdf; Bimbo, A, *Marin Oils*, AOCS Lipid Library, available at https://lipidlibrary.aocs.org/edible-oil-processing/marine-oils.

alcohol).[18] The mixture is then heat distilled under a vacuum resulting in a condensate omega-3 ethyl ester solution.[19]  The concentration of omega-3s in the solution depends on variables within the distillation process, but typically ranges from 50-70%.[2] The constituent compounds are DHA Ethyl Esters and EPA Ethyl Esters — which are molecularly distinct from the precursor DHA and EPA triglyceride ("TAG") molecules. The diagram below shows the most common trans-esterification process beginning with crude fish oil and resulting in the formation of ethyl esters.[20]



---

[18] *See* MacKay Publication; *see also Triglycerides vs. Ethyl Ester Forms of Fish Oil*, Science Based Health, https://www.sciencebasedhealth.com/Fish-Oil-EE-vs-TG-omega-3s-which-is-better-W119.aspx.

[19] Molecular distillation is a type of short-path vacuum distillation, characterized by an extremely low vacuum pressure which is performed using a molecular still. This process is characterized by short term exposure of the distillate liquid to high temperatures in high vacuum in the distillation column and a small distance between the evaporator and the condenser. https://en.wikipedia.org/wiki/Molecular_distillation; *See also* Breivik, H., H. G.G., and B. Kristinsson, *Preparation of highly purified concentrates of eicosapentaenoic acid and docosahexaenoic acid*, JAOCS, 1997. 74(11): p. 1425-29; Breivik, H. *Concentrates. In: Long Chain Omega-3 Specialty Oils*, pp. 111-140, The Oily Press Bridgwater England (2007).

[20] Bimbo, A.P. *Processing of marine oils. In: Long Chain Omega-3 Specialty Oils*, pp. 77-109 (H. Breivik (ed.) The Oily Press Bridgwater England) (2007).

43.     The trans-esterification process allows manufacturers to do several things that yield significant financial benefits: (1) Increase the levels of EPA-EE and DHA-EE far in excess of the limits of TAG EPA and TAG DHA in fish oil. Where the standard fish oil yields only 30% DHA/EPA by volume, trans-esterification allows manufacturers to obtain DHA-EE and EPA-EE that yields upwards of 70% by volume; (2) Alter the natural ratios of DHA/EPA (i.e., 120 mg / 180 mg per 1000 mg) to create DHA-EE / EPA-EE in any ratio the manufacturer desires; (3) Use low grade crude fish oil generated from fish offal -- heads, viscera and other body parts discarded in preparing fish for consumption (i.e. fish waste) -- in lieu of a whole small oily fish (e.g., sardine, anchovy, menhaden) that are traditionally caught and processed for the production of fish oil. In addition to being low quality, offal produces small volumes of oil compared to whole fish because the edible species from which they are derived are primarily non-fatty fish.[21] For example, a study exploring the efficiency of extracting oil from the heads of two tuna species, found the crude oil yields are only between 1-2%, far less than the average 30% yield from whole fish species that are caught specifically for rendering of fish oil.[22] Inconsistent and low yields, in addition to the fact that the raw materials consist of fish waste renders the resulting crude fish oil unsuitable for human consumption and requires trans-esterification to create a marketable product.[23]

44.     At the end of the trans-esterification process, the crude fish oil has been substantially transformed into Fatty Acid Ethyl Esters consisting of DHA-EE, EPA-EE and other

[21] Bimbo, A. (2011). Marine oils; edible oil processing. AOCS Lipid Library, December 2016, available at http://lipidlibrary.aocs.org/OilsFats/content.cfm?ItemNumber=40332

[22] Kasmiran, B. 2018, *Comparison and evaluation of the quality of fish oil and fishmeal extracted from the heads of Yellowfin tuna (Thunnus albacares) and Albacore tuna (Thinnus alalunga),* Nations University Fisheries Training Programme, Iceland, available at http://www.unuftp.is/static/fellows/document/britney16prf.pdf.

[23] Alfio, V, et al, *From Fish Waste to Value: An Overview of the Sustainable Recovery of Omega-3 for Food Supplements*, Molecules. 2021 Feb; 26(4): 1002. Published online 2021 Feb 13. doi: 10.3390/molecules26041002 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7918619/

OM3 fatty acid ethyl esters. At this point, the solution may be encapsulated as a dietary supplement, further concentrated into a drug or even sold as biodiesel.[24]

45.    Ultimately, once trans-esterified, fish oil is substantially and irrevocably transformed into fatty acid ethyl esters -- a substance that cannot be found in any part of any fish. Therefore, simply calling it "fish oil," is deceptive, misleading and in violation of the law.

## D.    FATTY ACID ETHYL ESTERS ARE NOT FISH OIL

### (1)    *The Omega-3 (DHA & EPA) Found in Natural Fish Oil is Molecularly Distinct From DHA-EE & EPA-EE Resulting From Trans-Esterification*

46.    The trans-esterification process substantially and irrevocably transforms the Omega-3s in fish oil from their natural triglyceride form into Omega-3 fatty acid ethyl esters. Critically, these substances, (fish oil and omega-3 fatty acid ethyl esters), are distinguishable on a molecular level such that it is impossible as a matter of law or logic for them to share a common or usual name.  Indeed, they do not. Along with their molecular differences, they have different common or usual names which must be properly represented on labeling of any dietary supplement in which they are contained. To do otherwise is deceptive, misleading, fraudulent and illegal.

---

[24] *See e.g.*, Lovaza Prescribing information available at
https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021654s023lbl.pdf; Rahman, Enhanced Production of Fatty Acid Ethyl Ester with Engineered fabHDG Operon in Escherichia coli ("Biodiesel, or fatty acid ethyl ester (FAEE), is an environmentally safe, next-generation biofuel. Conventionally, FAEE is produced by the conversion of oil/fats, obtained from plants, animals, and microorganisms, by transesterification") available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6920873/#:~:text=Biodiesel%2C%20or%20fatty%20acid%20ethyl,%2C%20and%20microorganisms%2C%20by%20transesterification.

| | DHA[25] | DHA-EE[26] |
|---|---|---|
| **Empirical Formulae** | $C_{22}H_{32}O_2$ | $C_{24}H_{36}O_2$ |
| **Molecular Weight** | 328.50 g/mol | 356.55 g/mol |
| **Synonyms** | Docosahexaenoic acid Doconexent, Cervonic acid, Doconexento Doconexentum Doxonexent Docosahexaenoate | Docosahexaenoic acid ethyl ester Ethyl docosahexaenoate Cervonic acid ethyl ester |
| **CAS Reg. No.[27]** | 25167-62-8 | 81926-94-5 |

[25] See NIH, National Library of Medicine available at https://pubchem.ncbi.nlm.nih.gov/compound/445580

[26] See NIH, National Library of Medicine available at https://pubchem.ncbi.nlm.nih.gov/compound/9831416

[27] A CAS Registry Number is a unique and unambiguous identifier for a specific substance. Each number is a unique numeric identifier and designates only one substance. CAS Registry is the premier source relied upon by scientists, manufacturers, regulators, and data scientists worldwide for accurate information on chemical substances. Not only do EPA, DHA, EPA-E and DHA-EE have unique CAS Registry Numbers that distinguish them from one another, Fish Oil itself also has a unique CAS Registry Number (8016-13-5). https://www.cas.org/support/documentation/chemical-substances/faqs.

**Molecular Structures**



| | EPA[28] | EPA-EE[29] |
|---|---|---|
| **Empirical Formulae** | $C_{20}H_{30}O_2$ | $C_{22}H_{34}O_2$ |
| **Molecular Weight** | 302.5 g/mol | 330.51 |
| **Synonyms** | Eicosapentaenoic acid<br>Icosapent, 10417-94-4<br>Icosapento<br>Icosapentum<br>Timnodonic acid | Eicosapentaenoic acid ethyl ester<br>Epadel<br>Ethyl eicosapentaenoate<br>Ethyl eicosapentaenoic acid<br>Ethyl icosapentaenoate<br>Ethyl icosapentate<br>Ethyl-eicosapentaenoic acid<br>Ethyl-EPA<br>Icosapentaenoate<br>icosapentate<br>Icosapent ethyl<br>Timnodonic acid ethyl ester |
| **CAS Reg. No.** | 25378-27-2 | 86227-47-6 |

---

[28] Pub Chem, available at https://pubchem.ncbi.nlm.nih.gov/compound/446284

[29] Pub Chem, available at https://pubchem.ncbi.nlm.nih.gov/compound/9831415

**Molecular
Structures**



47.     As demonstrated above, these molecules are distinct in every regard. They have

different molecular weights, chemical structures, physical properties and common/usual names.

**(2)**     Monographs

48.     The United States Pharmacopeia ("USP") is one of the most comprehensive

sources for medicine and dietary supplement standards in the world. The USP National

Formulary ("USP-NF") provides over 5000 reference standards for medicines and over 300

reference standards for dietary supplements. The standards are used to help ensure the quality of

these products and their ingredients, and to protect the safety of patients.[30]

49.     Among its quality standards, the USP-NF provides a series of monographs which

articulate the quality expectations for "identity, strength, purity, and performance" of certain

drugs and dietary supplements. *Id*. Included among the USP references for dietary substances are

monographs for Docosahexaenoic Acid Ethyl Ester (500 mg); Docosahexaenoic Acid (250 mg);

---

[30] https://www.usp.org/about/public-policy/overview-of-monographs

Eicosapentaenoic Acid (300 mg); Eicosapentaenoic Acid Ethyl Ester; Fish Oil Omega-3 Acid

Ethyl Esters Concentrate; Omega-3-Acid Ethyl Esters; and Fish Oil (1 g).

  50.  Figure A below juxtaposes the mass spectra of the USP monograph for fish oil

with that of Target's Product.[31] As demonstrated below, fish oil is an amazingly complex natural

product which consists of hundreds of constituent ingredients. In contrast, the Target's Product is

a synthetic construct consisting primarily of DHA-EE and EPA-EE. Each peak represents a

different molecule with a unique mass to charge ratio (m/z). From a macro perspective, the

monographs undeniably demonstrate that these are distinct products.

---

[31] United States Pharmacopeia – National Formulary Catalog # 1270424, available at
https://store.usp.org/OA_HTML/ibeCCtpItmDspRte.jsp?sitex=10020:22372:US&item=33515



Figure A: Comparison of USP Fish Oil standard with Target's Product.

51.    In addition to the USP, numerous other industry and scientific authorities independently confirm the differences between fish oil and Omega-3 fatty acid ethyl esters.

52.    Codex Alimentarius Commission ("Codex") was created in 1963 by two U.N. organizations, the Food and Agriculture Organization and the World Health Organization. Its main purpose is to protect the health of consumers and to ensure fair practices in international trade in food through the development of food standards, codes of practice, guidelines and other recommendations. Codex standards and guidelines are developed by committees, which are open to all member countries. Member countries review and provide comments on Codex standards and related texts at several stages in the development process. In the United States, public

meetings are held to receive comments on Codex drafts and comments are invited from all interested parties. Although Codex standards and related texts are voluntary, they do provide a template for laws and are used by the World Trade Organization as an agreed benchmark in global trade disputes.[32]

53.    FDA participates and exercises leadership in the Codex Alimentarius Commission. The objective of FDA's participation in Codex is to develop science-based international food safety, labeling, and other pertinent standards that provide consumer protection, labeling information, and prevention of economic fraud and deception that are consistent with U.S. regulations and laws.

54.    FDA uses procedures that promote consumer protection and transparency, as it works with the U.S. Codex Office to develop U.S. Delegation positions on matters before relevant Codex committees.[33]

55.    In 2017, the Codex Alimentarius Committee adopted standards for fish oil. It was a long process that started in 2011 "involving many discussions on the finer details which was important to clarify as the purpose of this Standard is to protect consumer health and promote fair practices in the trade of fish oil."[34]  Significantly, the Codex, like the USP, recognizes and draws a distinction between natural fish oil and trans-esterified products.[35]

---

[32] FDA, *Responses to Questions about Codex and Dietary Supplements*, available https://www.fda.gov/food/dietary-supplements-guidance-documents-regulatory-information/responses-questions-about-codex-and-dietary-supplements#what (last visited April 13, 2021).

[33] FDA, *FDA's Participation in Codex*, available at https://www.fda.gov/food/international-cooperation-food-safety/fdas-participation-codex (last visited April 13, 2021).

[34] IFFO, *CODEX Standard for Fish Oil*, available at https://www.iffo.net/codex-standard-fish-oil (last visited April 13, 2021).

[35] Section 2.2 defines "Fish oils" as those derived from one or more species of fish or shellfish.[35] In contrast, Section 2.6 defines "Concentrated fish oils ethyl esters" as those derived from fish oils described in Section 2.1 to 2.4 and are primarily composed of fatty acids ethyl esters. See, *Report of the U.S. Delegate, 25th Session, Codex Committee on Fats and Oils, United States Department of Agriculture*, available at

56.     Similarly, the Global Organization for EPA and DHA omega-3s ("GOED"), the largest and most significant trade group of the Omega-3 industry, also maintains a series of monographs which, like the USP and CODEX, differentiate between triglycerides, ethyl esters and re-esterified triglyceride Omega-3s as well a series of particular fish oils (e.g., Salmon, Tuna, Anchovy, etc). It provides members "technical guidance on specific and recommended test methodologies and quality parameters for a number of EPA and/or DHA containing product classes currently covered under the GOED Voluntary Monograph."[36] EPA/DHA-containing product classes currently covered by this GOED Voluntary Monograph [include]: Refined EPA and/or DHA Omega-3 Oil Triglycerides, EPA and/or DHA Omega-3 Oil Ethyl Ester Concentrates, EPA and/or DHA Omega-3 Oil Triglyceride Concentrates, Tuna Oil, Salmon Oil and Anchovy Oil. Consistent with the USP and Codex, GOED's monographs confirm that fish oil is not synonymous with fatty acid ethyl esters and cannot be so named.

### (3)     U.S. Customs and Border Protection

57.     The U.S. Customs and Border Protection ("CBP") is one of the world's largest law enforcement organizations whose duties include the facilitation of lawful international trade.[37] Among other things, the CPB is responsible for the interpretation and enforcement of the Harmonized Tariff Schedule of the United States ("HTS") which is a hierarchical structure for describing all goods in trade for duty, quota, and statistical purposes.[38]

---

https://www.usda.gov/sites/default/files/documents/delegates-report-02272017.pdf (last visited April 13, 2021).

[36] GOED Voluntary Monograph, Version 7.2, March 15, 2021 , available at https://goedomega3.com/goed-monograph (last visited April 13, 2021).

[37] See, U.S. Customs and Border Protection available at https://www.cbp.gov/about (last visited April 13, 2021).

[38] United States International Trade Commission, available at https://www.usitc.gov/harmonized_tariff_information (last visited April 13, 2021).

58.     The CPB has issued more than 20,000 rulings related to the proper interpretation of products and where they may be classified under the HTS.

59.     On several occasions the CPB considered the appropriate tariff classification for Omega-3 Acid Ethyl Esters. Consistently, the CPB recognized that trans-esterification **substantially transforms** fish oil into a different product which results in a different tariff classification.

60.     In 2011, the CPB tested and reviewed a product that was described as "a gelatin capsule containing 1000 milligrams of fish oil, said to be derived from anchovy, sardine, herring or other fish species." The CPB determined that the "fish oil" had been substantially transformed from its original fish oil source -- "the crude fish oil has been refined and chemically modified by deodorizing, ethylating (conversion of triglycerides to ethyl esters), distillation, winterizing/cold filtrating, bleaching and drumming."  Accordingly, while the petitioner sought to classify the trans esterified product under Section 1504.20.4000 of the HTS which pertains to "fish-liver oils and their fractions, whether or not refined, **but not chemically modified**," the CPB concluded that "[b]ased on the manufacturing process of the fish oil, they will be classified elsewhere…. The applicable subheading for these products will be 2106.90.9998, HTSUS, which provides for food preparations not elsewhere specified or included…other…other…other. The duty rate will be 6.4 percent ad valorem." (emphasis added).[39]

---

[39] Customs Ruling, N171795, July 5, 2011, available at https://rulings.cbp.gov/search?term=N171795&collection=ALL&sortBy=RELEVANCE&pageSize=30&page=1; *See also,* HQ H295287 (June 18, 2020) available at https://rulings.cbp.gov/search?term=HQ%20H295287&collection=ALL&sortBy=RELEVANCE&pageSize=30&page=1 ("CBP has a long-standing position that in order to be classified in Chapter 15, HTSUS, as fats or oils, products must predominantly be composed of triglycerides. See Headquarters Ruling Letter ("HQ") H102457, dated September 8, 2010; HQ 963166, dated December 11, 2001; HQ 965396, dated July 23, 2002; HQ 964531, dated March 14, 2002; HQ 965699, dated September 25, 2002; New York Ruling Letter ("NY") N234974, dated November 19, 2012…. Accordingly, only products composed primarily of triglycerides are classifiable under heading 1515, HTSUS."); See*, also,* United States Pharmacopeia – National Formulary monograph catalog confirming different HTSUS as between fish oil and Omega-3 Fatty Acids.

61.     Just as an apple cannot be called a pear, an omega-3 acid ethyl ester cannot be called fish oil. Target is obligated by law to label its Products truthfully and accurately. At bottom, this Product is a fatty acid ethyl ester. Labeling and selling it as fish oil is false, misleading, deceptive and unlawful.

## FEDERAL LAW

62.      The Federal Food, Drug & Cosmetic Act ("FDCA") broadly regulates the sale of food and beverages to the consuming public.  21 U.S.C §301.  It was promulgated in significant part to prevent consumer deception and was principally implemented through the creation of a uniform system of labeling on which consumers could rely to make informed purchasing decisions.

63.     The FDCA prohibits the misbranding of any food. 21 U.S.C. §331(b).  Generally, a food is misbranded if, among other things, its labeling is false or misleading.  21 U.S.C. § 343.

64.     The Nutrition Labeling and Education Act of 1990 amended the FDCA by requiring that most foods, including dietary supplements, bear nutrition labeling. Subsequently, the Dietary Supplement Health and Education Act of 1994 ("DSHEA") amended the Act, in part, by defining "dietary supplements," adding specific labeling requirements for dietary supplements, and providing for optional labeling statements.

65.     Dietary supplements must bear labeling in accordance with applicable provisions of FDCA. Target Product labels not only violate the clear mandates of the FDCA, but are independently false, misleading, and operate as a deception on the consuming public.

        **(1)**   *Fish Oil is not the Common or Usual Name of the Product*

66.    The principal display panel ("PDP") of the Target Product describes the supplement as "Fish Oil" containing 1000 mg of EPA/DHA Omega-3s.

**Section 21 C.F.R. 101.3**  states in relevant part:

(a) The principal display panel of a food in package form shall bear as one of its principal features a statement of the identity of the commodity. (b) Such statement of identity shall be in terms of: (1) The name now or hereafter specified in or required by any applicable Federal law or regulation; or, in the absence thereof, (2) The common or usual name of the food; or, in the absence thereof (3) An appropriately descriptive term, or when the nature of the food is obvious, a fanciful name commonly used by the public for such food.

67.    The statement of identity for a dietary supplement is the name that appears on the label of the dietary supplement. As a general matter, the statement of identity of a dietary supplement is the name specified by federal law or regulation, or, if no such name is specified, its common or usual name.  If the dietary supplement has no common or usual name and its nature is not obvious, the statement of identity must be an appropriately descriptive term.[40]

68.    As demonstrated in great detail herein, Fish Oil and Omega-3 Acid Ethyl Esters are not the same. They are different on a molecular level and have different common and usual names.

69.    Target's misrepresentation is not only emblazoned on the Product's Principal Display Panel, but is repeated in the Products Supplement Facts Panel.

70.    It is indisputable that Target Products were trans-esterified – a process that substantially transformed oil derived from fish waste into a synthetic product consisting of fatty acid ethyl esters.

---

[40] See, 21 U.S.C. 321(ff)(2)(C), 21 U.S.C. 343(s)(2)(B), 21 CFR §101.1 and 21 CFR §101.3; FDA Dietary Supplement Labeling Guide "FDA Labeling Guide") available at https://www.fda.gov/food/dietary-supplements-guidance-documents-regulatory-information/dietary-supplement-labeling-guide-chapter-ii-identity-statement.

71.    Consumers wishing to ingest Omega-3s have numerous choices including those relevant here -- a natural marine source versus one that is chemically synthesized.  Each product is molecularly different and has an array of qualities that differ from one another. Among them: (1) Bioavailability (i.e., the degree and rate at which substances are absorbed into a living system). Several studies found that the optimal absorption of an ethyl ester formulation requires it to be taken with a high-fat meal – a dietary choice that many consumers, especially those generally concerned about heart-health, would likely try to avoid.[41]; (2) Presence of ethanol. The ethanol introduced in order to create EE-OM3 ethyl esters must be filtered through the liver where it is drawn off before the body converts the resulting free fatty acids back into triglyceride form. Even though the quantity of ethanol released in a typical dose of an Omega-3 supplement is small, at-risk groups such as alcoholics, pregnant women and young children should refrain from using fatty acid supplements that contain ethyl esters; [42] (3) Stability: Omega-3s in ethyl ester form are much less stable than those in their natural triglyceride form and more readily oxidize;[43] and (4) the fact that fish oil is a natural substance and the ethyl ester is chemically synthesized from fish waste, rancid and low grade oil.

---

[41] *See, e.g.*, L. Chevalier, et al, Comparison of Pharmacokinetics of Omega-3 Fatty Acid Supplements in Monoacylglycerol or Ethyl Ester In Humans: A Randomized Controlled Trial, European Journal of Clinical Nutrition (2020)(omega-3 fatty acids supplements on the market are esterified in triglycerides (TG) or ethyl ester (EE); the latter is absorbed less than other esterification forms); J.F. Lapointe, et al, *A Single-dose, Comparative Bioavailability Study of a Formulation containing OM3 as Phospholipid and Free Fatty Acid to an Ethyl Ester Formulation in the Fasting and Fed States*, Clinical Therapeutics/Volume 41, Number 3, 2019 (Results demonstrate that the bioavailabilities of EPA and DHA with Omega-3 Free fatty Acid are far less affected by the fat content of a meal as compared to the EPA and DHA ethyl esters in Omega-3 ethyl ester).

[42] https://www.filomedica.com.cy/wp-content/uploads/2015/02/Fish-Oil-Triglycerides-vs.pdf.

[43] Mackay, *A Comparison of Synthetic Ethyl Ester Form Fish Oil vs. Natural Triglyceride Form*, available from http://www.promedics.ca/site/downloads/Triglycerides%20vs%20Ethyl%20Esters.pdf.

72.     These qualities further differentiate the products in the marketplace and are material to consumers' purchasing decisions. Target's failure to identify their Products by their common and usual name, obfuscated the most important information that is conveyed about a product – its name and contents.  By failing to properly name its Products, Target has deceived Plaintiff and members of the class, depriving them of a consumer's most basic right – to make an informed purchasing decision.

(2)     *The Product is neither 100% Wild Alaskan nor Fresh*

73.     The Product's PDP claims that is it "100% Wild Alaskan" fish oil.  The Product's Side Panel not only reaffirms the misleading notion that the Product is "fish oil" but also that it sourced from walleye pollock caught wild in Alaskan waters and processed within hours to ensure freshness.



74.     In truth, the source material is fish waste – the tails, bones, heads, organs – left over from the fileting process and hardly consistent with the image Target ascribes to its Product. The resulting oil derived from this fish offal is not useable in this state and must be substantially transformed to be marketable. Upon information and belief, the fish offal oil is transported to a facility in Ohio, where it is trans-esterified and substantially transformed into a fatty acid ethyl

ester. At bottom, what Target calls Wild Alaskan Fish Oil is really a lab-synthesized Fatty Acid Ethyl Ester from Ohio. Labeling it as they do is false, misleading and deceptive.

## ECONOMIC INJURY

75.     Plaintiff sought to buy Products that were lawfully labeled, marketed and sold.

76.     Plaintiff saw and relied on Defendant's misleading labeling of its Products.

77.     Plaintiff believed that the Product purchased contained real fish oil.

78.     Plaintiff believed that the Product was lawfully marketed and sold.

79.     In reliance on the claims made by Defendant regarding the qualities of their Product, Plaintiff paid for a Product which they did not receive and/or paid a price premium.

80.     As a result of their reliance on Defendant's misrepresentations, Plaintiff received a Product that lacked the promised ingredient which they reasonably believed it contained.

81.     Plaintiff received a Product that was unlawfully marketed and sold.

82.     Plaintiff lost money and thereby suffered injury as they would not have purchased this Product and/or paid as much for it absent the misrepresentation.

83.     Defendant knows that the statement of identity and contents of a dietary supplement are material to a consumer's purchasing decision.

84.     Plaintiff altered his position to their detriment and suffered damages in an amount equal to the amounts they paid for the Product, and/or in additional amounts attributable to the deception.

85.     By engaging in the false and deceptive conduct alleged herein Defendant reaped, and continues to reap financial benefits in the form of sales and profits from its Product.

86.     Plaintiff would be willing to purchase Target Products again in the future should he be able to rely on Defendant's labeling and marketing as truthful and non-deceptive.

## CLASS ACTION ALLEGATIONS

87.    Plaintiff brings this action on behalf of themselves and on behalf of classes of all others similarly situated consumers defined as follows:

  a.  **National**: All persons in the United States who purchased Class Products in the United States during the Class Period.

  b.  **New York:** All persons in New York who purchased the Class Products in New York during the Class Period. [44]

  c.  **Class Period** is the maximum time allowable as determined by the statute of limitation periods accompanying each cause of action.

88.    Plaintiff brings this Class pursuant to Federal Rule of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3) and 23(c)(4).

89.    Excluded from the Classes are: (i) Defendant and its employees, principals, affiliated entities, legal representatives, successors and assigns; and (ii) the judges to whom this action is assigned.

90.    Upon information and belief, there are tens of thousands of members of the Class. Therefore, individual joinder of all members of the Class would be impracticable.

91.    There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

92.    Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common legal or factual questions include but are not limited to:

  a.  Whether Defendant marketed, packaged, or sold the Class Products to Plaintiff and those similarly situated using false, misleading, or deceptive statements or representations;

---

[44] Collectively referred to as "Class or Classes."

      b.   Whether Defendant omitted or misrepresented material facts in connection with the sales of their Products;

      c.   Whether Defendant participated in and pursued the common course of conduct complained of herein;

      d.   Whether Defendant's actions violate the N.Y. Gen. Bus. Laws §§ 349, et seq.;

      e.   Whether Defendant's actions violate N.Y. Gen. Bus. Laws §§ 350 et seq.;

      f.   Whether Defendant has been unjustly enriched as a result of their unlawful business practices;

      g.   Whether Defendant's actions constitute breach of express warranty;

      h.   Whether Defendant should be enjoined from continuing the above-described practices;

      i.   Whether Plaintiff and members of the Class are entitled to declaratory relief; and

      j.   Whether Defendant should be required to make restitution, disgorge profits, reimburse losses, and pay damages as a result of the above-described practices.

93.    Plaintiff's claims are typical of the claims of the Class, in that Plaintiff is a consumer who purchased Defendant's Product. Plaintiff is no different in any relevant respect from any other Class member who purchased the Product, and the relief sought is common to the Class.

94.    Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class he seeks to represent, and he has retained counsel competent and experienced in conducting complex class action litigation. Plaintiff and his counsel will adequately protect the interests of the Class.

95.     A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member likely will be relatively small, especially given the cost of the Products at issue and the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's conduct. Thus, it would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Moreover, even if members of the Class could afford individual actions, it would still not be preferable to class-wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

96.     In the alternative, the Class may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate preliminary and final equitable relief with respect to each Class.

97.     The requirements for maintaining a class action pursuant to Rule 23(b)(2) are also met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

98.     Plaintiff does not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiff relies on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## FIRST CAUSE OF ACTION
### Violation of Breach of Express Warranty

99.     Plaintiff incorporates each and every allegation contained in the paragraphs above as if rewritten herein.

100.    Plaintiff's express warranty claims are based on violations of N.Y. CLS UCC § 2-313 and § 2-607. Defendant was afforded reasonable notice of this claim in advance of the filing of this complaint.

101.    Defendant made express warranties to Plaintiff and members of the Class that the Products they purchased consisted of real fish oil.

102.    The express warranties made to Plaintiffs and members of the Class appear on every Product label. This warranty regarding the nature of the Product marketed by Defendant specifically relates to the goods being purchased and became the basis of the bargain.

103.    Plaintiff and Class members purchased the Products in the belief that they conformed to the express warranties that were made on the Products' labels.

104.    Defendant breached the express warranties made to Plaintiff and members of the Class by failing to supply goods that conformed to the warranties it made. As a result, Plaintiff and members of the Class suffered injury and deserve to be compensated for the damages they suffered.

105.    Plaintiff and the members of the Class paid money for the Products. However, Plaintiff and the members of the Class did not obtain the full value of the advertised Products. If Plaintiff and other members of the Sub-Class had known of the true nature of the Products, they would not have purchased them or paid less for them. Accordingly, Plaintiff and members of the Class have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

106.    Plaintiff and Class members are therefore entitled to recover damages, punitive damages, equitable relief such as restitution and disgorgement of profits, and declaratory and injunctive relief.

## SECOND CAUSE OF ACTION

### Violation of N.Y. Gen. Bus. Law §§ 349, *et seq.*

107.    Plaintiff incorporates each and every allegation contained in the paragraphs above as if rewritten herein.

108.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state ..."

109.    Defendant's labeling and marketing of the Product, as alleged herein, constitutes "deceptive" acts and practices within the meaning of GBL § 349.

110.    Plaintiff Rodriguez and Class Members have been injured inasmuch as they paid for and/or paid a premium for a Product that did not have the characteristics marketed, including that contrary to its label, was not fish oil.

111.    GBL § 349(h) provides in relevant part that "any person who has been injured by reason of any violation of [GBL § 349] may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."

112.    In accordance with § 349(h), Plaintiff Rodriguez seeks an order enjoining Defendant from continuing the unlawful deceptive acts and practices set forth above.

113.    Absent a Court order enjoining the unlawful deceptive acts and practices, Defendant will continue their false and misleading marketing campaign and, in doing so, irreparably harm each member of the Class.

114.    As a consequence of Defendant's deceptive acts and practices, Plaintiff Rodriguez and other members of the Class suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff and other members of the Class seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages. N.Y. GEN. BUS. LAW § 349(h).

**THIRD CAUSE OF ACTION**

**Violation of N.Y. Gen. Bus. Law §§ 350, *et seq.***

115.    Plaintiff incorporates each and every allegation contained in the paragraphs above as if rewritten herein.

116.    N.Y. Gen. Bus. Law § 350 declares false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state to be unlawful. The term 'false advertising' means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual. 91. N.Y. Gen. Bus. Law § 350-a(l).

117.    Defendant's labeling and advertisements contain untrue and materially misleading statements regarding the contents of the Supplement.

118.    Plaintiff Rodriguez and members of the Class have been injured inasmuch as they relied upon the labeling and advertising and paid a premium for a product that did not conform to its representations. Accordingly, Plaintiff and Class members received less than what they bargained and/or for which they paid a premium.

119.    Defendant's advertising and product labeling induced the Plaintiff and Class members to buy their Product.

120.    Defendant knew, or by exercising reasonable care should have known, that its statements and representations as described in this Complaint were untrue and/or misleading.

121.    Defendant made the material misrepresentations described in this Complaint on its Product labels.

122.    As a result of Defendant's false or misleading labeling and advertising, Plaintiff and Class members are entitled to monetary damages, statutory damages, injunctive relief, restitution, disgorgement of all monies obtained by means of Target's unlawful conduct, interest, and attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### Restitution Based On Quasi-Contract/Unjust Enrichment

123.    Plaintiff incorporates each and every allegation contained in the paragraphs above as if rewritten herein.

124.    Defendant's conduct in enticing Plaintiff and the Class to purchase their Products with false and misleading packaging is unlawful because the statements contained on the Defendant's Product labels are untrue.

125.    Defendant took monies from Plaintiff and the Class for these Products and have been unjustly enriched at the expense of Plaintiff and the Class as result of their unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on Defendant to restore these ill-gotten gains to Plaintiff and the Class.  It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiffs and Class members.

126.    As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs and the Class are entitled to restitution or restitutionary disgorgement in an amount to be proved at trial.

## PRAYER FOR RELIEF

THEREFORE, Plaintiff, on behalf of himself and on behalf of the other members of the Class and for the Counts so applicable on behalf of the general public request an award and relief as follows:

A.    An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiff be appointed Class Representative, and Plaintiff's counsel be appointed Lead Counsel for the Class.

B.    Restitution in such amount that Plaintiff and all members of the Class paid to purchase Defendant's Product or restitutionary disgorgement of the profits Defendant obtained from those transactions, for Causes of Action for which they are available.

C.    Compensatory damages for Causes of Action for which they are available.

D.    Statutory penalties for Causes of Action for which they are available.

E.    Punitive Damages for Causes of Action for which they are available.

F.    A declaration and Order enjoining Defendant from marketing and labeling their Products deceptively, in violation of laws and regulations as specified in this Complaint.

G.    An Order awarding Plaintiff his costs of suit, including reasonable attorneys' fees and pre and post judgment interest.

H.    An Order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Defendant as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein.

I.    Such other and further relief as may be deemed necessary or appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action or issues so triable.

DATED: April 11, 2022                    Respectfully submitted,


Michael D. Braun
**KUZYK LAW, LLP**
1999 Avenue of the Stars, Ste. 1100
Los Angeles, California 90067
Telephone:    (213) 401-4100
Facsimile:    (213) 401-0311
Email:    mdb@kuzykclassactions.com


*Counsel for Plaintiff*